**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHER DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| SHENANDOAH HILLS WIND PROJECT, LLC, <br><br> Plaintiff <br><br> v. <br><br> PAGE COUNTY, IOWA; PAGE COUNTY BOARD OF SUPERVISORS; PAGE COUNTY BOARD OF ADJUSTMENT; JAMES D. KING, in his official capacity as Page County Zoning Administrator; JACOB HOLMES, TODD MAHER, and JUDY CLARK, in their official capacities as Page County Supervisors; , JAMES O'HARA, MICHAEL BARR, KALEN FULK, MERRILL KRUSE, and LINDSEY PIRTLE, each in their official capacities as Members of the Page County Board of Adjustment, <br><br> Defendants. | Case No. 1:23-cv-00005 <br><br> **Related Case No. 1:22-cv-00017** <br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      Plaintiff Shenandoah Hills Wind Project, LLC ("SHW") has spent several years and more than $10.3 million carefully developing a state-of-the-art wind project to be constructed in Page and Fremont Counties, with the full knowledge of local officials.

2.      Last fall, opponents to the Project brought suit against the Page County Board of Supervisors and Page County challenging the validity of a permit granted to SHW for the Page County portion of the Project and the ordinance under which the permit was granted.

3.      SHW intervened and assisted the County in defending against the opponents' action, which this Court dismissed on January 31, 2023. *See* Order, *Hunter et al. v. Page County, Iowa et al.*, Case No. 1:22-cv-00017-RP-HCA (S.D. Iowa Jan. 31, 2023), ECF No. 84.

4.      Just days later, SHW received a letter dated February 3, 2023 (the "Decision"), purporting to be a legally binding decision by the Page County Zoning Administrator on behalf of the County that the permit application approved by the Board of Supervisors on August 2, 2022, and thus the resulting permit—the same approval and permit the County had just defended as valid before this Court—are now "void."  *See* Ex. A.

5.      SHW appealed to the Page County Board of Adjustment, which upheld the Decision during a public hearing held on March 3, 2023.  Shenandoah Hills now brings this action to vindicate its common law, statutory, and constitutional rights.

## THE PARTIES

6.      Plaintiff SHW is a limited liability company organized under the laws of Delaware with its principal place of business in Chicago, Illinois.  SHW is authorized and in good standing to conduct business in the State of Iowa.

7.      Defendant Page County, Iowa (the "County") is a county and corporate body under the laws of Iowa.

8.      Defendant Page County Board of Supervisors ("Supervisors" or "Board of Supervisors") is the board of supervisors and governing body for the County under the laws of Iowa.  *See* Iowa Code § 331.301(2).

9.      Defendant Page County Board of Adjustment ("Board of Adjustment") is the board of adjustment for Page County under the laws of Iowa.  *See* Iowa Code §§ 331.321(r), 335.10(1).

10.     Defendant James D. King ("King") is the Page County Zoning Administrator, the Page County Engineer, and a citizen of Iowa.  King is sued only in his official capacity as the Page County Zoning Administrator.  *See* Iowa Code §§ 331.321(r), 335.9.

11.     Defendant Jacob Holmes ("Holmes") is a Page County Supervisor and a citizen of Iowa.  Holmes is sued only in his official capacity as a Page County Supervisor.

12.     Defendant Todd Maher ("Maher") is a Page County Supervisor and a citizen of Iowa.  Maher is sued only in official capacity as a Page County Supervisor.

13.     Defendant Judy Clark ("Clark") is a Page County Supervisor and a citizen of Iowa.  Clark is sued only in her official capacity as a Page County Supervisor.

14.     Defendant James O'Hara ("O'Hara") is a Member of the Page County Board of Adjustment and a citizen of Iowa.  O'Hara is sued only in his official capacity as a Member of the Page County Board of Adjustment.

15.     Defendant Merrill Kruse ("Kruse") is a Member of the Page County Board of Adjustment and a citizen of Iowa.  Kruse is sued only in his official capacity as a Member of the Page County Board of Adjustment.

16.     Defendant Michael L. Barr ("Barr") is a Member of the Page County Board of Adjustment and a citizen of Iowa.  Barr is sued only in his official capacity as a Member of the Page County Board of Adjustment.

17.     Defendant Kalen Fulk ("Fulk") is a Member of the Page County Board of Adjustment and a citizen of Iowa.  Fulk is sued only in his official capacity as a Member of the Page County Board of Adjustment.

18.     Defendant Lindsey Pirtle ("Pirtle") is a Member of the Page County Board of Adjustment and a citizen of Iowa.  Pirtle is sued only in her official capacity as a Member of the Page County Board of Adjustment.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over Counts I and II under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including Amendments V and XIV to the United States Constitution.

20.     This Court has supplemental jurisdiction over Counts III, IV, and V under 28 U.S.C. § 1367(a).

21.     This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202.

**FACTUAL ALLEGATIONS**

22.     SHW is an affiliate of Invenergy LLC, an experienced developer of renewable energy projects throughout the United States and globally, with fourteen wind projects across Iowa that are currently operational and more currently under development.

23.     Since at least the fall of 2019, SHW has been carefully developing a state-of-the-art commercial wind energy conversion system ("WECS") to be constructed in Page and Fremont Counties (the "Project").

24.     SHW has invested over $10.3 million developing the Project.

25.     The Project is anticipated to bring millions of dollars in payments to landowners, millions of dollars in new tax revenue, and temporary and permanent jobs to Page County— tangible benefits to the local economy that will multiply over time.  *See* Iowa Code § 427B.26; *see also* Ex. C at 2.

26.     The Project will also provide clean, renewable energy to the electrical grid in southwest Iowa, consistent with bipartisan state and federal policy.  *See, e.g.*, Iowa Code §§ 476.41-.43, .53, .53A; § 18B.1(3).

**Page County Ordinance #2019-2**

27.     At least as early as September 2019, SHW informed the County through its Board of Supervisors of its interest in developing and constructing a WECS in Page County, and the County subsequently drafted a proposed wind ordinance.

28.     On or about September 17, 2019, the Board of Supervisors scheduled a public hearing on the proposed wind ordinance.

29.     On or about October 29, 2019, the Board of Supervisors enacted the proposed wind ordinance as Page County Ordinance #2019-2, entitled "An Ordinance Regulating the Placement of Wind Energy Conversion Systems (WECS) on Property Located in the Unincorporated Areas of Page County, Iowa" (the "Wind Ordinance").

30.     A true and correct copy of the Wind Ordinance is attached to this Complaint as Exhibit B.

31.     The Board of Supervisors enacted the Wind Ordinance pursuant to their authority under chapter 331 of the Iowa Code, not chapter 335.  *See, e.g.*, Iowa Code §§  331.301(1)–(3), 331.302; *see also* Order at 22, *Hunter et al. v. Page County, Iowa et al.*, Case No. 1:22-cv-00017-RP-HCA (S.D. Iowa Jan. 31, 2023), ECF No. 84; Iowa Code ch. 335 (entitled "County Zoning").[1]

32.     The express purpose of the Wind Ordinance is to promote the public health, safety, comfort, and general welfare; facilitate economic opportunities for rural residents; promote

---

[1] SHW notes that there appears to be a typographical error not directly relevant to the proposition for which this Court is cited above in the relevant sentence, which states, "Further, unlike the ordinance in *Mathis*, the [Page County] Wind Ordinance is not a zoning ordinance or an amendment to a zoning ordinance."  *See* Order at 22.  Based on context and the citation that follows, SHW believes the Court intended to use the word "like" rather than "unlike" in this sentence because the ordinance the Iowa Supreme Court upheld in *Mathis*, like the Wind Ordinance in Page County, was a standalone ordinance that was not a zoning ordinance or an amendment to a zoning ordinance.  *See Wind Energy Conversion Systems Ordinance for Palo Alto, Iowa* (Sept. 27, 2016), *available at* https://paloaltocounty.iowa.gov/wp-content/uploads/2016/08/Wind-Energy-Conversion-Systems-Ordinance-SM.pdf (the 2016 wind ordinance referenced in *Mathis v. Palo Alto Cnty. Bd. of Supervisors*, 927 N.W.2d 191 (Iowa 2019)).

increased renewable energy production; and establish guidelines for the siting, construction, and operation of WECS.  *See* Ex. B at 2 (§ 1).

33.     The Wind Ordinance sets forth requirements for applicants seeking permits to site and construct a WECS in Page County, including, but not limited to, the following: a detailed site layout showing the location of all proposed wind turbines and items to which a setback applies; the total height and rotor diameter of the proposed turbines; documentation of land ownership or legal control of the property on which the project facilities were proposed; affirmation that a sound study was completed showing the maximum sound levels produced by the wind turbines as measured at non-participating residences generally would not exceed 55 decibels; affirmations that any necessary applications have been filed with the Federal Communications Commission ("FCC") and Federal Aviation Administration ("FAA"), including applications for determinations that the proposed turbine locations pose no hazard to air navigation; and affirmation that an environmental review has been completed to identify significant migratory flyways and nesting areas for federally listed birds, bats, and endangered species within one mile of the proposed turbine sites.  *See* Ex. B at 4–5 (§ 3(A)).

34.     The Wind Ordinance further sets forth requirements applicable to the siting, construction, and operation of commercial WECS ("C-WECS") in Page County including, but not limited to, the following:  specifications for the color, finish, tower configuration, lighting, and signage; minimum blade tip ground clearance; a prohibition on interference with licensed or planned microwave paths; a requirement that any interference with electromagnetic communications such as radio, telephone, or television signals caused by any wind turbine be minimized and mitigated; compliance with all FAA standards and regulations; compliance with the National Electrical Code and other applicable standards; compliance with setbacks from

inhabited structures, property lines, public rights-of-way, radio communication pathways, conservation and other publicly owned areas, and municipalities; and a requirement that all wiring connecting the wind turbines to the project substation be underground.  *See* Ex. B at 5–8 (§ 4).

35.     The Wind Ordinance requires that a permit application be submitted to the Page County Zoning Administrator or his designee, accompanied by a fee of $250 "per Wind Turbine that is a part of the application," for a determination that the Ordinance requirements have been satisfied.  Once the Zoning Administrator has made that determination, "the completed WECS Application and any/all necessary supporting documentation shall be presented to the Page County Board of Supervisors for approval."  Ex. B at 4–5 (§§ 3, 3(A)(12)).

36.     The Wind Ordinance directs that, "The Page County Board of Supervisors, upon approval of an application, shall authorize the Zoning Administrator to provide any necessary building permits for each Wind Turbine."  *See* Ex. B at 5 (§ 3(A)(12)).

37.     The Wind Ordinance provides, "If there are any material changes to the information provided as part of the application in Section 3 that occur from the time of the application until the construction of the WECS, the applicant shall submit a new application (along with an application fee per Wind Turbine with changed information) together with the updated information for each Wind Turbine (with changes to the information required to be provided in Section 3) and any such change shall be in compliance with this Ordinance."  *See* Ex. B at 5 (§ 3(A)(12)).  It further provides that the new application once again be presented to the Board to the Supervisors by the Zoning Administrator.  *Id.*

38.     In addition, the Wind Ordinance requires that, prior to construction of any commercial WECS, the permit holder or owner must enter into road use and decommissioning agreements with the County substantially in the form of two model agreements attached to the

Ordinance; it further commands that the County's "approval and execution of the[se] agreement[s] shall not be unreasonably withheld." *See* Ex. B at 8 (§ 5(1), (3)).

39.     The purpose of the decommissioning agreement is to protect the County against unforeseen costs associated with decommissioning and removal of the WECS components at the end of the Project's useful life by requiring all wind turbines to be dismantled and removed within 180 days after the cessation of their use, outlining the anticipated means of decommissioning and associated costs, and identifying "the financial resources that will be available to pay for decommissioning and removal." Ex. B at 20–21 (§ 2 of model decommissioning agreement).

40.     The purpose of the road use agreement is to protect the County against unforeseen costs associated with repairing damage to local roads by requiring that roadways used in connection with the Project "be restored to preconstruction condition . . . at no cost to the County." Ex. B at 8 (§ 5(1)).

**SHW's Permit and the Permitting Process**

41.     Following the enactment of the Wind Ordinance, SHW continued developing the Project in preparation for submitting a permit application to the County.

42.     In order to ensure its application fully complied with the Wind Ordinance, SHW had to acquire land rights; perform the initial geotechnical and engineering analyses required to determine proposed wind turbine sites and a proposed project layout; file notices of proposed construction with the FAA in connection with each of the proposed turbine sites; and commission site-specific analyses by qualified experts, including a sound study to determine anticipated sound levels associated with the proposed turbine locations and possible turbine models at non-participating residences throughout the project footprint, a study to determine anticipated impacts to microwave communications paths and electromagnetic communications, and environmental

analyses to determine any significant migratory flyways and nesting areas for federally listed birds, bats, or endangered species within one mile of the proposed turbine sites; and obtain a general liability insurance policy covering bodily injury and property damage with policy limits of at least $3 million per occurrence and $6 million in the aggregate. *See* Ex. B at 4–5, 6–7, 9 (§§ 3(A), 4(8)–(11), 8).

43.     In addition to the development activities that were necessary to address the requirements of the Wind Ordinance, SHW continued performing other development activities necessary to developing and operating a WECS.

44.     SHW completed the costly generator interconnection process for the Project with the Midcontinent Independent System Operator ("MISO"),[2] a requirement for interconnecting the Project and transmitting the power it generates to the grid.

45.     SHW also applied for and received a permit from the County to construct a meteorological (MET) tower to gather data necessary to designing the site layout for the Project and then installed the MET tower.

46.     SHW applied for and received a permit from the Board of Adjustment and associated building and driveway permits from Administrator King related to the electrical facilities necessary to transmit the power generated by the Project to the grid.

47.     In preparing to submit the permit application, SHW also hired qualified consultants to address other topics it believed might be of interest to residents of the County or the Supervisors themselves, including anticipated shadow flicker at non–participating residences, anticipated

---

[2] MISO is an independent, not-for-profit organization that operates under the regulatory authority of the Federal Energy Regulatory Commission and is responsible for managing the flow of high-voltage electricity across 15 U.S. states and the Canadian province of Manitoba, facilitating the regional electricity market, and planning the grid for the future.

economic and tax impacts, commonly asked questions about health impacts, and the potential impact on local property values.  *See* Ex. C at 1, 12–13.

48.     While gathering information necessary for and preparing its permit application for the County, SHW consulted Administrator King on several occasions to ensure the permit application would address everything required to demonstrate full compliance with the Ordinance as interpreted by the County.

49.     Prior to the submission of the application to the County, King confirmed that SHW would be required to submit a new permit application under the Wind Ordinance if (1) SHW wished to construct turbines at *additional* locations in Page County not listed in their original application or (2) the final, constructed location of any turbine would be more than 300 feet from its proposed location in the application.

50.     Notably, however, King never informed SHW that smaller adjustments to the final, constructed location of any turbine or the *elimination* of any proposed turbine location from the Project would require SHW to submit a new permit application.  *See infra* ¶ 75.

51.     SHW submitted its permit application to King on March 7, 2022, and provided the County with a certified check for $7750 to cover the $250 application fee for each of the 31 potential turbine sites it sought to permit in Page County.

52.     True and correct copies of SHW's permit application as considered by the Supervisors, along with Appendices A and H thereto, are attached to this Complaint as Exhibit C.

53.     Appendix A to the permit application graphically depicted the 31 proposed turbine locations in Page County whose geographic coordinates were provided therein.  Ex. C at 4–5, 16.

54.     Appendix H to the permit application included a report analyzing potential interference with local radio broadcast stations and the recommended exclusion distance from a local radio station, Station KYFR.  Ex. C at 10, 32–39.

55.     SHW's permit application both (1) conveyed to the County that the final layout of the Project remained uncertain because the final number of turbines to be constructed had not yet been finally determined and (2) explicitly requested up to 300 feet in turbine siting flexibility in constructing the Project to accommodate unforeseen circumstances or optimization of the Project layout.  Ex. C at 4–5.

56.     Section 2.1 of the permit application, which provided an introductory summary of the proposed Project, expressly indicated the final number of turbines to be built and the turbine models to be utilized for the Project were both undetermined.  Ex. C at 4, 7.

57.     Section 2.1 of the permit application stated in part as follows:

> The Project, as currently proposed, will consist of <u>up to 64 turbines in total</u> depending on the final turbine technology selected, <u>with 31 turbine sites in Page County and 33 turbine sites in Fremont County</u>.  The <u>final "as-built" turbine locations ultimately selected</u> will be comprised of the locations depicted in Appendix A.  The Project is <u>anticipated to utilize either</u> the GE Sierra platform of 2.8 or 3.4 MW turbines or the Vestas V136-3.45 MW or V150-4.5 MW turbines to achieve a total nameplate generating capacity of <u>up to approximately</u> 246 MW of power.

Ex. C at 4 (emphasis added).

58.     Simple division demonstrates that if only turbines capable of generating 4.5 MW each were utilized for the Project, just 55 turbines would be needed to exceed 246 MW in total generating capacity.

59.     Section 2.2 of the permit application, which included a table depicting the geographic coordinates of the proposed turbine locations under consideration in Page County, also stated in part as follows:

> SHW requests that all WECS Wind Turbine locations identified in the table above maintain the ability to move and adjust their final, constructed location by up to 300 feet in any direction in order to accommodate unforeseen circumstances and potential refinements and optimization of the layout. All final, constructed turbine locations shall either meet or exceed all setback and siting standards described in the Ordinance.

Ex. C at 5 (emphasis added).

60.     Section 2.2 of the permit application thus expressly requested ability to adjust the final constructed turbine locations by up to 300 feet in any direction.  Ex. C at 5.

61.     Section 2.2 of the permit application also affirmed that all constructed turbine locations would meet all of the siting and setback requirements in the Ordinance.  Ex. C at 5.

62.     Section 3.1 of the permit application, which included a table listing relevant dimensions of the turbine models under consideration for the Project, also stated in part as follows:

> SHW will evaluate turbine performance characteristics, factors of the site and economic considerations to arrive at a final turbine model decision.  The Application has been prepared with a set of turbine locations that can accommodate all four of these models, meaning that each location is compatible with setback requirements based on the tallest turbine.  Likewise, the noise analysis and shadow flicker analysis have been prepared with the highest possible impacts and demonstrate compliance with the Page County Ordinance.  So regardless of which of these four turbine models is ultimately chosen for construction, the project will comply with applicable requirements.  SHW reserves the right to utilize a combination of these turbines across the Project to achieve the most efficient project design.

Ex. C at 7 (emphasis added).

63.     Section 3.1 of the permit application thus expressly acknowledged that final turbine selections would be determined at a later date.  Ex. C at 7.

64.     Section 3.1 of the permit application also affirmed that all applicable Ordinance requirements that could potentially be affected by final turbine model selection would be met. Ex. C at 7.

65.     Section 4.2 of the permit application, which addressed section 4(8) of the Ordinance, stated in part as follows:

> The C-WECs owner shall minimize and mitigate any interference with electromagnetic communications, such as radio, telephone or television signals caused by any Wind Turbines. If, after construction of the C-WECS, the owner or operator receives a written complaint related to the above-mentioned interference, the owner or operator shall take reasonable steps to respond to the complaint. Please see the attached communication report included with this application as **Appendix H**. Per Appendix H, SHW was advised to stay three (3) kilometers (km) from the AM towers for Station KYFR, licensed out of Shenandoah, IA. <u>SHW has communicated with Station KYFR to discuss mitigation options for potential interference</u> due to the potential construction of turbines 54, 56, 57, 64, and 65 located within three (3) km from the tower location. <u>SHW agrees that prior to construction of these turbines, a mutual agreement with the station must be achieved, to demonstrate compliance with the Ordinance directive</u>.

Ex. C at 10 (emphasis added).

66.     Section 4.2 of the permit application thus expressly confirmed that SHW would ensure compliance with the Wind Ordinance directive regarding radio signal interference. The construction of the five turbines that had been identified as potentially interfering with the broadcast signal was expressly conditioned on reaching an agreement with Station KYFR . Ex. C at 10.

67.     Appendix H to the permit application acknowledged a "minimum separation distance" of three kilometers was necessary to avoid potential problems with AM radio broadcasts by Station KYFR based on its antenna type and broadcast frequency. Ex. C at 38.

68.     Given recent supply chain and market volatility, SHW understandably could not predict the future availability, cost, or procurement timelines for specific turbine models under consideration for the Project when it submitted its permit application.

69.     For these reasons and others, Shenandoah Hills was careful to explain—in the permit application itself and during public meetings following its submission but prior to its approval—that the final layout for the Project remained undetermined.

70.     Upon receiving the permit application, Administrator King began performing a detailed review to determine whether it complied with the Wind Ordinance, a process that took over two months.

71.     During his review, King occasionally sought clarification regarding matters in the permit application, but he never asked SHW to provide the exact number or exact locations of all the turbines to be constructed if the Project was approved.

72.     Shortly after submitting the permit application to King, SHW learned that a single participating landowner had incorrectly executed easement agreements associated with three of the proposed turbine locations in Page County.

73.     SHW therefore submitted an addendum to the permit application to King on March 21, 2022, wherein it withdrew its request to permit those three proposed turbine locations.

74.     A true and correct copy of the addendum to the permit application is attached to this Complaint as Exhibit D.

75.     Administrator King accepted the addendum and continued reviewing the permit application without requiring payment of any additional fee.

76.     On April 26, 2022, SHW provided the Board of Supervisors with an economic report addressing the projected tax revenues the Project would generate in Page and Fremont Counties.  Ex. E at 1.

77.     On or about May 31, 2022, King deemed SHW's permit application compliant with the Ordinance and presented the entire application, including the addendum, to the Supervisors for approval in accordance with section 3(A)(12) of the Wind Ordinance.  *See* Ex. B at 5.

78.     Over the two months that followed, the Supervisors discussed the application at several public meetings and retained outside counsel at Ahlers & Cooney to assist them with reviewing the pending application for compliance with the Wind Ordinance and addressing questions raised by members of the public, as reflected in the official minutes of its July 5 meeting. Ex. E at 15.

79.     True and correct copies of the official minutes of the 2022 Board of Supervisors' meetings held on April 26, May 31, June 21, June 30, July 5, July 12, August 2, August 9, August 30, and September 6, and the official minutes of the 2023 Board of Supervisors' meetings held on January 3, January 4, January 5, January 10, January 17, and January 24 are attached to this Complaint as Exhibit E.

80.     The Board of Supervisors' meetings are updated to the Page County Iowa YouTube channel which is accessible at https://www.youtube.com/@pagecountyiowa5306/videos and is expressly intended for the public.  Ex. E at 44–45, 49.

81.     The official minutes of the May 31 meeting show that the entire time the application was under consideration by the Board of Supervisors, the Board of Supervisors was fully aware that SHW no longer sought to construct turbines at every location within Page County identified in the permit application.  Ex. E at 5.

82.     The official minutes of the June 21 and August 2 meetings show that the Board of Supervisors was informed that only 28 of the potential turbine locations identified in the permit

application remained within the proposed Project when it considered and approved the permit application. Ex. E at 9, 18.

83.     Administrator King was present at the May 31, June 21, and August 2 meetings. Ex. E at 4, 7, 18.

84.     The official minutes of the June 30 meeting confirm that SHW representatives appeared before the Board of Supervisors and conveyed that SHW was working to reach an agreement with Station KYFR before constructing turbines that could cause potential radio interference. Ex. E at 11–13

85.     The official minutes of the July 12 and August 2 meetings confirm that Station KYFR and SHW had not reached an agreement about 3 of the 5 potential turbine locations expressly made subject to such an agreement in the application a few weeks prior to the approval of the application and still had not reached such an agreement when the application was approved. Ex. E at 16, 20.

86.     Administrator King was present at the June 30, July 12, and August 2 meetings. Ex. E at 11, 16, 18.

87.     On August 2, 2022, a majority of the Board of Supervisors concluded that SHW's permit application met all of the Wind Ordinance requirements, consistent with King's determination and the advice received from their legal counsel, and voted to approve it, as reflected in official minutes of the public meeting on that date. Ex. E at 20–21.

88.     The video of the August 2 meeting is posted to the Page County Iowa YouTube channel and accessible to the public at https://www.youtube.com/watch?v=a_ZhBHPcrAM&ab_channel=PAGECOUNTYIOWA.

89.     During the August 2 meeting, Supervisors Alan Armstrong and Chuck Morris voted in favor of approving the SHW's permit application, thereby granting a WECS permit to SHW; Supervisor Holmes voted against approving the permit application.  Ex. E at 20–21.

90.     The video and minutes of the August 2 meeting reflect that Supervisor Morris explained that the Board sought the advice of counsel with regard to Station KYFR and had been advised that SHW's application, including the manner in which it addressed the issue with Station KYFR, met the Ordinance requirements.  Ex. E at 20–21.

91.     The video and minutes of the August 2 meeting also show that, during a discussion regarding questions the Board had raised to and been advised on by legal counsel, Supervisor Holmes expressed frustration regarding how others, including County Attorney Carl Sonksen, were interpreting the phrase "material change" as used in the Ordinance.  Ex. E at 21.

92.     The video of the August 2 meeting shows that Supervisor Holmes argued that a "material change" requiring SHW to resubmit a new application had occurred because SHW had decided not to build turbines at three proposed turbine locations listed in the application.  Holmes raising the meaning of the phrase "material change" is also reflected in the meeting minutes.  Ex. E at 21.

93.     The video of the August 2 meeting shows that, immediately after the motion to approve the application was made, Supervisor Holmes questioned whether the motion included any conditions, stating "Is there no contingencies?  There should be contingencies. . . ." and arguing that some condition concerning "the radio station" should be attached to the approval.

94.     The video and meeting minutes of the August 2 meeting also show that, while the motion to approve the application was pending, Supervisor Holmes again expressed his opinion

that because "turbines were removed" there had been a "material change" to the application under the Ordinance.  Ex. E at 21.

95.    The video and meeting minutes of the August 2 meeting also show that, on the same motion, Supervisors Armstrong and Morris voted to approve the permit application without conditioning either the Board's approval or the Board's grant of a WECS permit to SHW on either the total number of turbines to be constructed or the outcome of SHW's negotiations with Station KYFR, and without requiring SHW to submit a new application.  Ex. E at 21.

96.    Administrator King was present at the August 2 meeting.  Ex. E at 18.

**This Court's Dismissal of the Challenge to the Permit**

97.    In September 2022, a group of opponents to the Project sued the County in state district court, seeking to void both the Ordinance and the vote approving the permit application and granting the permit (the "Related Case").

98.    The following month the County removed the Related Case to this Court.  *See* Notice of Removal, *Hunter et al. v. Page County, Iowa et al.*, Case No. 1:22-cv-00017-RP-HCA (S.D. Iowa Oct. 18, 2022), ECF No. 1.

99.    While the Related Case was pending, Supervisor Morris negotiated the decommissioning agreement required by the Ordinance with SHW on behalf of the Board, and Supervisor Armstrong negotiated the road use agreement required by the Ordinance with SHW on behalf of the Board, consistent with the procedure that had been recommended by their counsel and adopted by Board vote a few months prior.  Ex. E at 28–29, 30–31.

100.   To date, however, the Board has never placed consideration or approval of either the road use or the decommissioning agreement on its agenda for one of its meetings.

101.   At the beginning of January 2023, while the Related Case was pending, a change in the composition of the Board of Supervisors occurred and Supervisor Armstrong, who had voted

in favor of granting SHW the permit and had negotiated a road use agreement with SHW, was replaced by newly elected Supervisor Maher.

102.    During the first Board of Supervisors meeting with the newly constituted Board on January 3, 2023, Supervisor Holmes, who had vigorously opposed the Project, became Chairperson of the Board when the Board approved Resolution #1-2023.  Ex. E at 35.

103.    Immediately following the January 3 meeting, Supervisor Morris, who had voted in favor of granting SHW the permit and had negotiated the decommissioning agreement with SHW, resigned from the Board of Supervisors because he was moving and would no longer meet the statutory residency requirement.

104.    The newly constituted Board of Supervisors met on the morning of January 4, 2023, and the afternoon of January 5, 2023, and the minutes of those meetings reflect that immediately after each of those meetings began Supervisors Holmes and Maher voted "to go into closed session per chapter 21.5.1.c to discuss legal counsel."  Ex. E at 41.

105.    Hours after the closed session of the Board of Supervisors on January 4, 2023, the County filed a notice of consent to remand in the Related Case, abandoning its resistance to the opponents' motion for remand that was then-pending before this Court.

106.    On January 6, 2023, this Court held a hearing on the opponents' and Holmes' motions to remand and the County's and SHW's motions to dismiss in the Related Case, during which attorneys from Ahlers & Cooney appeared for the Board.

107.    On January 17, 2023, the newly constituted Board of Supervisors voted to retain outside legal counsel regarding the commercial WECS "application process" but did not state who they planned to retain.  Ex. E at 47.

108.    On information and belief, the outside legal counsel retained following the January 17 vote was Jason Palmer, who recently joined the firm Lamson Dugan & Murray LLP.

109.    The Board of Supervisors has not publicly acknowledged its decision to change the County's outside legal counsel during any open meeting.

110.    The Board of Supervisors has not publicly acknowledged the identity of the new outside legal counsel retained by the County during any open meeting.

111.    On January 25, 2023, a second group of opponents to the Project, represented by the same counsel who represented the opponents in the Related Case, sued neighboring Fremont County and the Fremont County Board of Supervisors once again seeking to halt development of the Project, either by invalidating the June 2020 enactment of a substantially similar wind ordinance by the Fremont County Board of Supervisors or by invalidating the even earlier July 2022 grant of a WECS permit to SHW for the Fremont County portion of the Project.  *See* Petition, *Jennings, et al v. Fremont County, Iowa, et al*, Case No. EQCV025651 (Iowa Dist. Ct. Jan. 25, 2023).

112.    Thereafter Supervisor Clark, who was appointed to fill the position formerly held by Morris, first appeared in a public meeting of the Board on January 30, 2023.

113.    On January 31, 2023, noting the significant investment of time and energy that the parties and the Court had made in the Related Case since it was removed, this Court denied the opponents' and Holmes' motions to remand and granted SHW's and the County's motions to dismiss the Page County opponents' action challenging SHW's permit and the Wind Ordinance. *See* Order, *Hunter et al. v. Page County, Iowa et al.*, Case No. 1:22-cv-00017-RP-HCA (S.D. Iowa Jan. 31, 2023), ECF No. 84.

**The Decision and Appeal to the Board of Adjustment**

114.    On February 3, 2023, three days after this Court denied the opponents' challenge

to SHW's permit, Administrator King issued the Decision on behalf of the County, which declared

that SHW's permit application, and by extension its permit, are void.  Ex. A at 1.

115.    King sent the Decision to SHW as an attachment to an email to SHW representative

Isaac Lamppa on Saturday, February 4, 2023.  Ex. A at 2.

116.    The Decision states as follows:

> The Page County Attorney has informed me of a letter of record from
> Family Stations, Inc. (FSI) addressed to the Page County Board of Supervisors
> stating that an agreement has been reached between FSI and the Shenandoah Hills
> Wind Project (SHWP), LLC.  The SHWP has agreed to eliminate three wind
> turbines, and with this change the radio station's signal will not be affected.
>
> This reduction of three wind turbines, combined with the previous reduction
> of three wind turbines by addendum dated March 21, 2022, is a decrease of six (6)
> turbines from the SHWP's initial application of March 7, 2022.  This reduction in
> the number of wind turbines constitutes a material change.  Therefore, according to
> the fourth sentence of the last paragraph of Section 3 of Page County Ordinance
> 2019-2, a new application must be submitted to reflect these changes in the SHWP,
> and the current application is void.
>
> As you know, a moratorium on receiving new applications is currently in
> effect.  However, it has an ending date of March 23, 2023.  I look forward to the
> submittal of a new application for the Shenandoah Hills Wind Project.

Ex. A at 1.

117.    A true and correct copy of the "letter of record" referenced in the Decision is

attached to this Complaint as Exhibit G.

118.    The "letter of record" reported that the owner of Station KYFR, Family Stations,

Inc., had withdrawn its objection to the Project because it had reached an agreement with SHW

whereby SHW had agreed not to construct turbines at three of the five locations identified in the

permit application as potentially interfering with the broadcast signal and therefore expressly

subject to agreement with Station KYFR.  Ex. F at 1, 3.

119.    The "moratorium on receiving new applications" referenced in the Decision referred to Resolution #42-2222, enacted August 9, 2022, which extended by 180 days the expiration date of the "Moratorium on C-WECS Construction Permits" contained in Resolution #26-2222 (which was enacted on March 29, 2022, and set to expire on September 24, 2022) to approximately March 23, 2022.  Ex. E at 26.

120.    When King issued the Decision, he was aware that SHW had informed the County, by filing an addendum before the Board of Supervisors began their review, it would not build turbines at three of the proposed turbine locations listed in the application; King himself had accepted the addendum and provided it to the Board of Supervisors and had been present at subsequent meetings where it was discussed.  *See supra* ¶¶73–75, 77, 81–83.

121.    King also knew that the Board of Supervisors approved the permit application with full knowledge that SHW would not build turbines at the same three proposed turbine locations. *See supra* ¶¶ 81–83, 92, 94–96.

122.    When King issued the Decision, he knew that the application had expressly conditioned the construction of turbines at up to five other proposed turbine locations on reaching an agreement with Station KYFR, because he had personally reviewed the application to determine its compliance with the Wind Ordinance and had been present at Board of Supervisors' meetings where that fact had been discussed.  *See supra* ¶¶ 70, 83–85.

123.    King also knew that the Board of Supervisors had approved the application with full knowledge that SHW had committed to not build turbines at those proposed locations without reaching an agreement with Station KYFR first in order to ensure compliance with the Ordinance and that Station KYFR and SHW had not yet reached such an agreement as to three proposed turbine locations.  *See supra* ¶¶ 83–85, 90, 93, 95–96.

124.    King issued the Decision despite knowing that the Board of Supervisors had been aware of these matters and approved the application in the form that was before them, including the addendum, and in doing so had rejected Holmes' position that conditions or "contingencies" should be attached to the approval.  *See supra* ¶¶ 90–96.

125.    During the Board of Supervisors' meeting on February 7, 2023, the day after SHW received the Decision, Supervisor Holmes stated that he wanted to start working on the County's wind ordinance and intended to put that on the agenda for the following week.

126.    During the Board of Supervisors' meeting the following week on February 14, 2023, the Supervisors discussed having "work sessions" to work on a new wind ordinance for the County beginning as soon as the following week.

127.    Also on February 14, 2023, SHW appealed the Decision to the Board of Adjustment, and undersigned counsel filed the appeal form and notice specifying the grounds for the appeal with the County by means of an email sent to County Attorney Carl Sonksen, Page County Auditor Melissa Wellhausen, and Administrator King.

128.    A true and correct copy of the appeal form and notice specifying the grounds for the appeal is attached to this Complaint as Exhibit G.

129.    Exhibits accompanying SHW's appeal to the Board of Adjustment included the Decision, the Wind Ordinance, the permit application with two appendices, the addendum, and the official minutes of 2022 Board of Supervisors' meetings held on May 31, June 21, June 30, July 12, and August 2.

130.    The Board of Adjustment presently does not have governing rules, nor did such rules exist on the date the appeal was filed.  *See* Iowa Code § 335.12.

131.     As of the date SHW filed its appeal with the Board of Adjustment, the County website did not provide instructions for filing an appeal with the Board of Adjustment or the names, mailing addresses, email addresses, or other contact information for its members.

132.     On February 17, 2023, SHW through its agents identified the names and addresses of the Board of Adjustment members and delivered to the home of each a copy of the appeal form, notice of appeal, and accompanying exhibits.   Administrator King thereafter confirmed each Member had received the deliveries of SHW's appeal materials.

133.     The same day, King scheduled a public hearing on the appeal of the Decision, to be held at the Page County Courthouse in Clarinda, Iowa, at 10:00 a.m. on Friday, March 3, 2023.

134.     The Board of Supervisors held a meeting on March 2, 2023, the day before the hearing on SHW's appeal of the Decision.

135.     A true and correct copy of the official agenda for the March 2, 2023, meeting is attached to this Complaint as Exhibit H.

136.     During the Board of Supervisors' meeting on March 2, 2023, the Supervisors voted to extend the "moratorium on receiving new applications" referenced in the Decision for an additional 180 days, by voting to approve Resolution #25-2023.

137.     A true and correct copy of Resolution #25-2023 containing the extended moratorium considered and approved by the Board of Supervisors during its meeting on March 2, 2023, is attached to this Complaint as Exhibit I.

138.     Also during its meeting on March 2, 2023, the day before the hearing on the appeal, the Board of Supervisors discussed many changes, well over a dozen, that they would like to include in a new wind ordinance and model road use agreement.

139.     The Board of Adjustment held the public hearing on SHW's appeal of the decision on March 3, 2023, during which Page County Attorney Carl Sonksen represented Administrator King to defend his Decision on behalf of the County.

140.     During his presentation to the Board of Adjustment at the hearing, Mr. Sonksen acknowledged that the definition of the term "material" suggests something "having to do with matter as distinguished from form" and "so substantial and important as to influence" a decision.

141.     Mr. Sonksen further acknowledged that the evidence on which the decision of the Board was to be based consisted of the record before it, which consisted of the exhibits provided by SHW with its notice of appeal and was not supplemented by the County.  *See supra* ¶ 129.

142.     Following the presentations by undersigned counsel and Mr. Sonksen, the members of the Board of Adjustment held a discussion just prior to their vote.

143.     During that discussion, Board of Adjustment member Fulk told the other members that SHW had not followed FCC regulations with regard to the location of their turbines and insisted on multiple occasions that "all they need to do is reapply" to get a new permit—"they" meaning SHW.

144.     The FCC does not have siting or permitting jurisdiction over wind turbines, nor does the Decision mention this alleged failure to follow "FCC regulations" as a basis for the purported "voiding" of SHW's permit.

145.     The moratorium, which the Board of Supervisors had extended just the prior evening in order to enable it to pass a new wind ordinance, is understood by the Board of Supervisors and King to prevent SHW from reapplying for a new WECS permit until it expires, as indicated in the Decision itself, unless the Board of Supervisors ends it upon the passage of a new wind ordinance.

146.     During the hearing, two other members of the Board of Adjustment, Kruse and O'Hara, questioned why the appeal was before the Board of Adjustment at all.

147.     The Board of Adjustment ultimately voted 4-0 to deny the appeal and affirm the Decision, with Kruse abstaining because he did not believe the appeal should be before the Board of Adjustment.

**Authority of the Board of Adjustment**

148.     The following provisions of the Page County, Iowa Zoning Ordinance (the "Zoning Ordinance") and chapter 335 of the Iowa Code may be relevant to this action.

149.     Section 335.9 of the Iowa Code is entitled "Administrative officer."  It provides in its entirety:

> Administrative officer.  The board of supervisors shall appoint an administrative officer authorized to enforce the resolutions or ordinances adopted by the board of supervisors.  The administrative officer may be a person holding other public office in the county, or in a city or other governmental subdivision within the county, and the board of supervisors is authorized to pay to the officer compensation as it deems fit.

Iowa Code § 335.9.  King is the designated "Administrative officer" for the County.

150.     Section 13.1 of the Zoning Ordinance defines the duties and responsibilities of the Page County Zoning Administrator.  It provides in its entirety:

> The Zoning Administrator, upon appointment by the Board of Supervisors, shall be responsible for the administration and enforcement of this ordinance. The administrator's duties shall include the following:
>
> 1. Issuing building permits and collecting fees for same.
>
> 2. Handle administrative duties relative to this ordinance for the Zoning Commission and the Board of Supervisors.
>
> 3. Enforce the ordinance and identify site violations.
>
> 4. Explain provisions of the ordinance to citizens requesting information.

Zoning Ordinance § 13.1.

151.    Section 335.13 of the Iowa Code is entitled, "Appeals to board."   This section provides in its entirety:

> Appeals to the board of adjustment may be taken by any person aggrieved or by any officer, department, board or bureau of the county affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board of adjustment, by filing with the officer from whom the appeal is taken and with the board of adjustment a notice of appeal specifying the grounds thereof.

Iowa Code § 335.13

152.    Section 335.15 of the Iowa Code is entitled, "Powers of board."   It provides in its entirety:

> The board of adjustment shall have the following powers:
>
> 1.  To hear and decide appeals where it is alleged there is error in any order, requirement, decision or determination made by an administrative official in the enforcement of this chapter or of any ordinance adopted pursuant thereto.
>
> 2.  To hear and decide special exceptions to the terms of the ordinance upon which such board is required to pass under such ordinance.
>
> 3.  To authorize upon appeal, in specific cases, such variance from the terms of the ordinance as will not be contrary to the public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done.

Iowa Code § 335.15.

153.    Section 335.16 of the Iowa Code is entitled, "Decision."   This section provides in its entirety:

> In exercising the powers in section 335.15, the board of adjustment may, in conformity with the provisions of this chapter, reverse or affirm, wholly or partly, or may modify the order, requirement, decision, or determination appealed from and may make such order, requirement, decision, or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.

Iowa Code § 335.16.

154.     Section 14.3 of the Zoning Ordinance defines the powers of the Page County Board of Adjustment and is entitled, "Powers."  It provides in, in relevant part:

> The Board shall have the following powers:
>
> 1.  To hear and decide appeals where it is alleged that there is an error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance.
>
>     . . . .
>
> 4.  The decision of the Board is final and the only further appeal is through the courts.  The Board is independent from both the Board of Supervisors and the Zoning Commission.

Zoning Ordinance § 14.1.

155.     It is the explicit policy of the State of Iowa to encourage the development of wind energy.  *See* Iowa Code §§ 476.41-.43, .53, .53A.  This policy extends to the decisions made by counties and county officials.  *See* Iowa Code § 18B.1(3).

156.     Chapter 335 of the Iowa Code is entitled "County Zoning" and contains provisions that "shall be applicable to any county of the state at the option of the board of supervisors" should it decide to enact county zoning regulations pursuant to Iowa Code chapter 331.  *See* Iowa Code §§ 331.301(1)–(2), 331.304(4), 331.321(1)(r).

157.     Whereas section 335.13 appears to indicate that any party aggrieved by any decision by a zoning administrator has a right to appeal that decision to a board of adjustment, section 335.15 appears to grant boards of adjustment the power to hear only appeals of decisions by an administrative officer that were made in the enforcement of chapter 335 or a county zoning ordinance, and section 14.3 of the Page County Zoning Ordinance appears to grant the Board of Adjustment the power to hear appeals concerning a decision made by the Zoning Administrator only in the enforcement of Page County Zoning Ordinance.

158.    The Decision issued by King was intended to enforce the Wind Ordinance, which is neither an ordinance adopted pursuant to chapter 335 nor a county zoning ordinance.

## COUNT I
### Takings
### All Defendants

159.    SHW realleges and incorporates by reference all allegations in this Complaint.

160.    The Takings Clauses of the United States and Iowa Constitutions prohibit the taking of property or protected property interests without the payment of just compensation.

161.    Government action may effect a taking whether by regulation, statute, ordinance, or miscellaneous decree.  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).

162.    Under Iowa and federal law, a regulatory taking occurs when a government action "may so frustrate distinct investment-backed expectations" or destroy owners' or investors' "primary expectation concerning the use" as to amount to a taking.  *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127, 136 (1978).

163.    Under Iowa and federal law, a *per se* taking occurs when a government action denies an owner of all economically beneficial use of their property rights in a parcel.  *Bormann v. Bd. of Sup'rs In and For Kossuth Cnty.*, 584 N.W.2d 309, 316 (Iowa 1998).

164.    SHW has constitutionally protected interests in land, the WECS permit, and vested rights obtained through its substantial investment in and development of the Project in the County, the construction of a MET tower, and actions taken in bad faith by one or more Page County officials.

165.    The Decision severely frustrates SHW's distinct investment-backed expectations concerning the use of the land SHW invested in within the County.

166.    The Decision eviscerates SHW's primary expectation concerning the use of the land SHW invested in within the County.

167.    The Decision eliminates all economically beneficial use of SHW's property rights in land within the County.

168.    The Decision eliminates all economically beneficial use of SHW's WECS permit and the rights it conferred in connection with the use of the land SHW invested in within the County.

169.    The Decision does not serve a public purpose.

170.    SHW received no just compensation in connection with the government taking of its constitutionally cognizable property rights.

171.    The Decision thus violates the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, section 18 of the Iowa Constitution.

**COUNT II**
**Procedural Due Process**
**Against the All Defendants**

172.    SHW realleges and incorporates by reference all allegations in this Complaint.

173.    The Due Process Clause of the United States Constitution prohibits government actors from depriving anyone of protected property interests without due process of law.

174.    Due process imposes procedural constraints on governmental decisions and dictates that some form of hearing is required before an individual is deprived of a property interest.

175.    The fundamental requirement of procedural due process dictates that government must provide notice and a meaningful opportunity to be heard prior to any deprivation of protected property interests. *Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976).

176.    A decision by a county board or official affecting the use of one's property involves an interest in property for which some process is due. *Sear v. Clayton Cnty. Zoning Bd. of Adj.*, 590 N.W.2d 512, 516 (Iowa 1999).

177.     SHW has constitutionally protected property interests in land, the WECS permit, and vested rights obtained through its investment in and development of the Project in the County.

178.     The Decision thus violates the Fifth and Fourteenth Amendments to the United States Constitution.

## COUNT III
### Vested Rights
### Against the Zoning Administrator, the County and the Board of Supervisors

179.     SHW realleges and incorporates by reference all allegations in this Complaint.

180.     Under Iowa law, "a developer may acquire a vested right" in completing the development of a project under an existing or previously existing ordinance "because of substantial expenditures made in reliance on the previously existing ordinance." *See, e.g.*, *Geisler v. City Council of City of Cedar Falls*, 769 N.W.2d 162, 167 (Iowa 2009).  The vested rights doctrine applies when a developer (a) has made substantial expenditures prior to a change to the governing ordinance and (b) those expenditures were lawfully made. *Id.*

181.     Further, a developer may acquire a vested right to complete the development of a project under an existing or previously existing ordinance by virtue of actions taken by county officials acting "in bad faith or with malice."  *See, e.g., U.S. Cellular Corp. v. Bd. of Adj. of City of Des Moines*, 589 N.W.2d 712, 719 (Iowa 1999).

182.     When local officials attempt to change the existing governing law to stop a particular project or frustrate a particular applicant's plans for development, "it can be discerned that an improper purpose exists." *Geisler*, 769 N.W.2d at 168–69.

183.     SHW has invested substantial time and resources developing the Project for construction in the County.

184.     SHW has made substantial expenditures developing the Project for construction in the County, including in particular in performing development activities necessary to submit a

permit application that was fully compliant with the County's existing Ordinance and others necessary to developing and operating a WECS.

185.    SHW's development activities have included obtaining a permit for and constructing a MET tower in Page County.

186.    The substantial expenditures SHW has made in developing the Project were all lawfully made with any associated permits or approvals required from the County obtained in advance.

187.    The substantial expenditures, time, and resources SHW has invested in furtherance of the Project have been consistent with and in reliance on the terms of the Wind Ordinance in effect since October 29, 2019.

188.    In making substantial investments and expenditures developing the Project, SHW relied in good faith on the Wind Ordinance and acted with the knowledge of county officials.

189.    The Decision was issued to prevent SHW from constructing the Project.

190.    The Decision was issued to allow time for the Board of Supervisors to consider and enact a new Wind Ordinance.

191.    The Moratorium was extended to prevent SHW from obtaining a new WECS permit under the existing Wind Ordinance.

192.    The process of declaring SHW's WECS permit void followed immediately by the extension of the moratorium for the express purpose of replacing the Wind Ordinance it was granted under constituted an action aimed directly at SHW and taken in bad faith and for the purpose of stopping or delaying the Project.

193.    Accordingly, SHW has a vested right under Iowa law to complete development of the Project consistent with the conditions of its WECS permit and the provisions of the Wind Ordinance.

## COUNT IV
### Certiorari
### Against the Zoning Administrator, the County, and the Board of Supervisors

194.    SHW realleges and incorporates by reference all allegations in this Complaint.

195.    Under Iowa law, certiorari is available when a board or officer exercising judicial functions "exceeded proper jurisdiction or otherwise acted illegally." Iowa R. Civ. P. 1.1401.

196.    Illegality of a quasi-judicial action taken by a county board or officer is established when the "decision was not supported by substantial evidence; or if its actions were unreasonable, arbitrary, or capricious." *Geisler*, 769 N.W.2d at 168.

197.    The Decision constitutes a quasi-judicial action taken by Administrator King that was taken by virtue of authority vested in him by the Board of Supervisors on behalf of the County.

198.    The Decision is not supported by substantial evidence because the elimination of the number of proposed turbine locations referenced in the Decision was contemplated in the application, so no material change to the information provided in the application occurred.

199.    The Decision is not supported by substantial evidence because all material facts stated in the application remain true, so no material change to the information provided in the application has occurred.

200.    The Decision is not supported by substantial evidence because there is no record of any matter or information considered by Administrator King in making it, other than the letter from Station KYFR, which merely confirmed that wind turbines would not be constructed in three of the five proposed turbine locations with respect to which construction had been expressly conditioned on approval by Station KYFR in the application.

201.    The Decision is not supported by substantial evidence because the elimination of three proposed turbine locations referenced therein by addendum submitted prior to the consideration or approval of the application by the Board of Supervisors was not regarded as a material change to the information provided in the application when the application was approved August 2, 2022.

202.    The Decision is not supported by substantial evidence and is unreasonable, arbitrary, and capricious because it ignores the plain meaning of words and express statements in the application.

203.    The Decision is not supported by substantial evidence and is unreasonable, arbitrary, and capricious because it ignores the plain meaning of words and express statements in the addendum to the application.

204.    The Decision is not supported by substantial evidence and is unreasonable, arbitrary, and capricious because it ignores the plain meaning of words and phrases appearing in the Wind Ordinance.

205.    The Decision is not supported by substantial evidence and is unreasonable, arbitrary, and capricious because it ignores the overwhelming evidence concerning the manner in which King and the Supervisors who voted to approve the application applied the Ordinance, including evidence in the official minutes and videos of Board of Supervisors' meetings.

206.    The Decision is not supported by substantial evidence and is unreasonable, arbitrary, and capricious because it ignores overwhelming evidence concerning what the Board of Supervisors knew and considered when it approved the application in the form before it on August 2, 2022, including the addendum.

207.    The Decision is not supported substantial evidence and is unreasonable, arbitrary, and capricious because it purports to be or is based an arbitrary determination regarding what constitutes a material reduction in the maximum number of turbines that could potentially be constructed rather than on any actual change to the information provided in the application.

208.    The Decision is not supported substantial evidence and is unreasonable, arbitrary, and capricious because the reason stated therein and any others subsequently alleged to have formed part of the basis for the Decision are fabricated post-hoc rationalizations.

209.    The Decision was also illegal because it constituted an unconstitutional taking of SHW's property without just compensation, an unconstitutional deprivation of SHW's of property without procedural due process, and a violation of Iowa law because SHW's right to complete the Project pursuant to its existing permit under the Wind Ordinance had vested, as pled in Counts I–III of this Complaint.

210.    Accordingly, the Decision must be vacated.

## COUNT V
### Certiorari
**Against the Board of Adjustment, the County, and the Board of Supervisors**

211.    SHW realleges and incorporates by reference all allegations in this Complaint.

212.    Under Iowa law, certiorari is available when a board or officer exercising judicial functions "exceeded proper jurisdiction or otherwise acted illegally." Iowa R. Civ. P. 1.1401.

213.    In addition, Iowa Code sections 335.18 and 335.19 provide that any person aggrieved by any decision of a board of adjustment may receive review by certiorari.

214.    Illegality of a quasi-judicial action taken by a county board or officer is established when the "decision was not supported by substantial evidence; or if its actions were unreasonable, arbitrary, or capricious." *Geisler*, 769 N.W.2d at 168.

215.    Affirming the Decision constituted a quasi-judicial action by the Board of Adjustment that was taken by virtue of authority vested in it by the Board of Adjustment on behalf of the County.

216.    Affirming the Decision was not supported by substantial evidence because the elimination of the number of proposed turbine locations referenced in the Decision was contemplated in the application, so no material change to the information provided in the application occurred.

217.    Affirming the Decision was not supported by substantial evidence because all material facts stated in the application remain true, so no material change to the information provided in the application has occurred.

218.    Affirming the Decision was not supported by substantial evidence because there is no record of any matter or information considered by Administrator King in making it, other than the letter from Station KYFR, which merely confirmed that wind turbines would not be constructed in three of the five proposed turbine locations with respect to which construction had been expressly conditioned on approval by Station KYFR in the application.

219.    Affirming the Decision was not supported by substantial evidence because the elimination of three proposed turbine locations referenced therein by addendum submitted prior to the consideration or approval of the application by the Board of Supervisors was not regarded as a material change to the information provided in the application when the application was approved August 2, 2022.

220.    Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the Decision ignores the plain meaning of words and express statements in the application.

221.   Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the Decision ignores the plain meaning of words and express statements in the addendum to the application.

222.   Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the Decision ignores the plain meaning of words and phrases appearing in the Wind Ordinance.

223.   Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the Decision ignores the overwhelming evidence concerning the manner in which King and the Supervisors who voted to approve the application applied the Ordinance, including evidence in the official minutes and videos of Board of Supervisors' meetings.

224.   Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the Decision ignores overwhelming evidence concerning what the Board of Supervisors knew and considered when it approved the application in the form before it on August 2, 2022, including the addendum.

225.   Affirming the Decision was not supported substantial evidence and is unreasonable, arbitrary, and capricious because it purports to be or is based an arbitrary determination regarding what constitutes a material reduction in the maximum number of turbines that could potentially be constructed rather than on any actual change to the information provided in the application.

226.   Affirming the Decision was not supported by substantial evidence and is unreasonable, arbitrary, and capricious because the reason stated therein and any others subsequently alleged to have formed part of the basis for the Decision are fabricated post-hoc rationalizations.

227.    Affirming the Decision was also illegal because the Decision constituted an unconstitutional taking of SHW's property without just compensation, an unconstitutional deprivation of SHW's of property without procedural due process, and a violation of Iowa law because SHW's right to complete the Project pursuant to its existing permit under the Wind Ordinance had vested, as pled in Counts I–III of this Complaint.

228.    In the alternative, affirming the Decision was an action taken by the Board of Adjustment without proper jurisdiction because the Board of Adjustment exceeded the scope of its power pursuant to section 14.3 of the Zoning Ordinance and Iowa Code § 335.15.

229.    Accordingly, the decision by the Board of Adjustment affirming the Decision must be vacated or reversed and the Decision vacated.

## RELIEF SOUGHT

WHEREFORE, Shenandoah Hills Wind Project, LLC requests the following relief from this Court.

230.    Enter an order declaring that the Decision is invalid because it constitutes a taking of SHW's property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, section 18 of the Iowa Constitution.

231.    Enter an order declaring that the Decision is invalid because it constitutes a deprivation of SHW's property without procedural due process in violation the Fifth and Fourteenth Amendments to the United States Constitution.

232.    Enter an order declaring that the Decision is invalid because SHW's right to complete the development of the Project consistent with the conditions of its WECS permit and the provisions of the Ordinance has vested such that (1) any subsequently enacted moratorium or ordinance regulating WECS in a manner that would impair or prevent SHW from constructing or

operating the Project is inapplicable to the Project, and (2) any unreasonable withholding of approval and execution of the agreements required under the Ordinance constitutes a violation of Iowa law.

233.     Enter an order granting SHW a writ of certiorari against Administrator King, the County, and the Board of Supervisors (1) declaring that King acted illegally in issuing the Decision and (2) vacating the Decision.

234.     Enter an order granting SHW a writ of certiorari against the Board of Adjustment, the County, and the Board of Supervisors (1) declaring that the Board of Adjustment exceeded its jurisdiction or otherwise acted illegally in affirming the Decision and (2) vacating or revising the decision of the Board of Adjustment affirming the Decision and vacating the Decision.

235.     Enter an order awarding SHW costs under Federal Rules of Civil Procedure 54 and any other applicable authority.

236.     Enter an order granting such other relief as the Court deems just and appropriate, including any relief it deems necessary to protect SHW from further violation of its rights.

Respectfully submitted this 5th day of March, 2023.

By: /s/ *Kristy Dahl Rogers*
    Bret A. Dublinske (AT0002232)
    Brant M. Leonard (AT0010157)
    Kristy Dahl Rogers (AT0012773)
    **FREDRIKSON & BYRON, P.A.**
    101 East Grand Avenue, Suite 301
    Des Moines, IA  50309
    Phone:  (515) 242-8900
    Fax:  (515) 242-8950
    Email:  bdublinske@fredlaw.com
            bleonard@fredlaw.com
            krogers@fredlaw.com

    **ATTORNEYS FOR SHENANDOAH HILLS WIND PROJECT, LLC**